**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RONALD W. BREITIGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 02-1333-GMS |
| | ) | |
| NEW CASTLE COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

_____

Frank E. Noyes, II, Esquire, of WHITE &WILLIAMS, LLP, Wilmington, Delaware.  Attorney for Plaintiff.

Eric L. Episcopo, Esquire, NEW CASTLE COUNTY LAW DEPARTMENT, New Castle, Delaware.  Attorney for Defendant.

_____

## OPINION

December 27, 2005.
Wilmington, Delaware

**SLEET, District Judge**

## I.      INTRODUCTION

In 2001, at age fifty five, Ronald Breitigan was terminated from his employment as a police officer with the New Castle County Police Department.  He subsequently initiated the above-captioned action against New Castle County ("the County"), alleging in Count I that his termination violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C.A. §§ 621-634 (1999).  All other counts were dismissed pursuant to a motion by the County.  *See Breitigan v. New Castle County*, 350 F. Supp. 2d 571 (D. Del. Oct. 13, 2004).  Presently before the court are the County's motion for summary judgment (D.I. 86), and Breitigan's motion for partial summary judgment (D.I. 88).  For the following reasons, the court will deny both motions.

## II.     JURISDICTION

The court has subject matter jurisdiction pursuant to 28 U.S.C.A. § 1331 (1993).

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©); *see also Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 392 (3d Cir. 1998).  Thus, summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party.  *Boyle*, 139 F.3d at 392.  A fact is material if it might affect the outcome of the suit.  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)).  An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue.  *Id.*  In deciding the motion,

the court must construe all facts and inferences in the light most favorable to the non-moving party.

*Id.*; *see also Assaf v. Fields*, 178 F.3d 170, 173-74 (3d Cir. 1999).

## IV.    BACKGROUND

The facts of this case are simple.  In 1988, at age forty two, Ronald Breitigan was hired as a police officer by the New Castle County Police Department.  In 2001, at age fifty five, Breitigan was terminated from his employment pursuant to mandatory retirement-age provisions in both the New Castle County Code, and the collective bargaining agreement between the County and its police officers.  Because Breitigan was only permitted to complete thirteen years of service, he was denied the full pension he would have received if he had completed twenty years of service.

## V.    DISCUSSION

In 1967, Congress passed the ADEA in an effort "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment."  29 U.S.C.A. § 621(b) (1999).  Hence, the central prohibitory clause of ADEA was written to prohibit essentially all age-based discrimination in the workplace.  *See* § 623(a).  As is customary in the legislative process, Congress carved out a few exceptions to this general rule.  One such exception, which has since been amended, provided:

> It shall not be unlawful for an employer . . . to observe the terms of a bona fide
> seniority system or any bona fide employee benefit plan such as a retirement,
> pension, or insurance plan, which is not a subterfuge to evade the purposes of this
> Act, except that no such employee benefit plan shall excuse the failure to hire any
> individual[.]

Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, § 4(f)(2), 81 Stat. 602, 603.

In a somewhat controversial 1976 opinion, the Supreme Court held in *United Air Lines, Inc. v.*

*McMann* that this exception was "intended to permit observance of the mandatory retirement terms of bona fide retirement plans." 434 U.S. 192, 202 (1976), *superseded by statute*, Age Discrimination in Employment Act Amendments of 1978, Pub. L. No. 95-256, § 2(a), 92 Stat. 189, 189.  In other words, the Court held that employers were permitted to impose mandatory retirement ages on employees, so long it was done pursuant to a bona fide retirement plan that was not a subterfuge to avoid the purposes of the ADEA.

With the specific aim of overturning *McMann*, Congress quickly amended section 4(f)(2) to clarify that "no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 12(a) of this Act because of the age of such individual." Section 2(a) of the Age Discrimination in Employment Act Amendments of 1978. Consequently, in 1978, mandatory retirement ages, including those imposed on law enforcement officers by state and local governments, became subject to invalidation unless it could be shown that age was a bona fide occupational qualification.  *See, e.g., EEOC v. Wyoming*, 460 U.S. 226, 240 (1983) (stating that state and local governments "remain free under the ADEA to continue [enforcing mandatory retirement ages], if they can demonstrate that age is a 'bona fide occupational qualification' for [a particular job]").  However, in 1986, while Congress was considering a bill to extend the ADEA to persons over age seventy, Representative Austin Murphy of Pennsylvania proposed an amendment in the House to allow state and local governments to impose mandatory retirement ages on law enforcement officers and firefighters without having to make such a showing. 132 Cong. Rec. 25426, 25442 (1986).  Citing studies showing that people of a certain age often have symptom-less conditions which render them susceptible to various catastrophic medical events, proponents of the Murphy amendment took the position that age is always a bona fide occupational

qualification for law enforcement officers and firefighters because their ability to protect the public and save lives is dependent upon their physical and mental well being.  According to Representative William Hughes of New Jersey and Rep. Murphy, the need for the amendment was dire:

> The fact of the matter is we cannot determine objectively whether anybody at the age of 50 or 70 really has in fact significant coronary disease.  It is very difficult to objectively determine.
>
> Now the problem area that we have to deal with is police officers and firefighters and people like air traffic controllers.
>
> Picture if you will a police car roaring to the scene of a crime with his partner supporting him and, unfortunately, suffers a heart attack and is unable to provide that support.  He puts his partner in jeopardy and the citizens he is there to protect in jeopardy.
>
> Picture if you will a fireman going to the scene of a fire and carrying the hose into the house, into a flaming inferno, to have the man holding the hose inside this building trying to get people suffering a heart attack and unable to get his partner out because he controlled the hose.  He puts himself, he puts his partners, and he puts the people he is there to protect in danger.

*Id.* at 25448 (statement of Rep. Hughes).

> I know that Congress people can perhaps serve and do serve very admirably until age 87 and beyond.  People serve in executive positions, in manual tasks.  But I submit that we should not [replace] our opinions of what is good for the public sector and the public-safety employee in saying that people who are 87 years of age or 90 years of age should be chasing drug smugglers down the street or fighting in pitched battles combating fires and combating criminals.

*Id.* at 25442 (statement of Rep. Murphy).

It is ironic that while the proponents of the Murphy amendment were decrying age discrimination generally by supporting a bill to eliminate the arbitrary age cap previously written into the ADEA, they were simultaneously defending arbitrary age discrimination against law enforcement officers and firefighters.  Although lives are often at stake in those professions, the 1986 legislative history contains no discernable evidence of increased accidents caused by older law

4

enforcement officers or firefighters subsequent to the Congressional overruling of *McMann* in 1978,[1] or similar data from jurisdictions without mandatory retirement ages.[2] Rather, the amendment seems to have been supported in large part by unabashed hyperbole of the type quoted above.[3] No one can seriously believe, but for the Murphy amendment, the nation would witness a dangerous influx of octogenarians "fighting in pitched battles combating fires and combating criminals." Indeed, the Jack La Lanne's of the world are few and far in between.

It is an unfortunate fact of life that a person's health will eventually decline. However, the severity and timing of that decline can only be foretold in the most general sense. For that reason, the ADEA was enacted as a means of forcing employers to evaluate employees on the basis of ability rather than preconceived notions. § 621(b). But, in endorsing the Murphy amendment, the

---

[1]Some House members seem to have misconstrued the Supreme Court's holding in *EEOC v. Wyoming*, 460 U.S. 226 (1983), as being the first time the ADEA was ever successfully applied to state and local governments. 132 Cong. Rec. at 25444. However, the *Wyoming* Court explicitly noted that the constitutionality of a 1974 amendment extending the ADEA to state and local governments, Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, § 28(a)(2), 88 Stat. 55, 78 (codified at 29 U.S.C.A. § 630(b) (1999)), had been upheld in eighteen of the twenty-one federal courts that had considered the question from 1976 to 1982, *Wyoming*, 460 U.S. at 234 n.6. Therefore, while it is true that the Supreme Court did not weigh in on the issue until 1983, mandatory retirement ages imposed by state and local governments actually became subject to invalidation in 1978. The source of the confusion probably stems from the fact that the EEOC did not actively pursue enforcement against those entities until after *Wyoming* was handed down. *Knight v. Georgia*, 992 F.2d 1541, 1544 (11th Cir. 1993) ("In the wake of the *Wyoming* decision, the EEOC initiated an enforcement effort targeting public employee mandatory retirement laws -- rules which in spite of the 1978 ADEA amendments were still common, particularly for firefighters and law enforcement officers.").

[2]According to Representative Claude Pepper of Florida, who spoke out against the Murphy amendment, neither Los Angeles nor Miami had mandatory retirement ages. 132 Cong. Rec. at 25433 (statement of Rep. Pepper).

[3]Another reason offered for the Murphy amendment was to give state and local governments the same power that the federal government possessed to set mandatory retirement ages for its public-safety employees. 132 Cong. Rec. at 25444. Supporters of that argument seem to have forgotten the old adage, "two wrongs do not make a right."

House of Representatives fell victim to the precise type of thinking it originally eschewed by passing

the ADEA.   Although the Senate also passed a form of the Murphy amendment, its version

contained a sunset provision that caused the legislation to expire on December 31, 1993.  132 Cong.

Rec. 32656, 32656 (1986).  Unlike the House, the Senate seemed cognizant of the tension between

the Murphy amendment and the underlying purposes of the ADEA:

> Special concerns about the public safety . . . have been raised.  To address
> those concerns, this bill includes temporary exemptions for State and local public
> safety officers . . . *to allow them to adjust to uncapping*.  These temporary
> exemptions *should not be regarded as an encroachment on the fundamental
> principles of the ADEA*.  During the 7-year exemption period, studies will be
> undertaken to evaluate and propose criteria for physical and mental fitness tests for
> police officers and firefighters . . . .

*Id.* at 32658 (emphasis added).  The Senate version, with the sunset provision, was eventually

approved by the House and signed into law.  Age Discrimination in Employment Amendments of

1986, Pub. L. No. 99-592, § 3, 100 Stat. 3342, 3342.

Pursuant to another provision in that version, the Center for Applied Behavioral Sciences at

the Pennsylvania State University conducted a study of the relationship between age and the

performance of public safety officers.  H.R. Rep. No. 103-314, at 7 (1993).  The study found that

"age is a *very imprecise predictor* of who will experience a catastrophic medical event while

performing a critical public safety task and a *poor predictor* of the decline of [an] individual's

ability."  *Id.* at 9 (emphasis added).  The study also concluded that age-based retirement policies are

not necessary because tests exist which adequately measure the physical and mental fitness of public

safety officers.  *Id.*  Nevertheless, partially because the study reported that "an estimated 8.75 events

per 100,000 public safety officers per year would occur in which people die or are injured as a result

of the sudden incapacitation of a public safety officer" without mandatory retirement ages,[4] *id.* at 10, the House Committee on Education and Labor recommended an indefinite extension of the Murphy amendment.[5]  *Id.* at 12.  Although the sunset provision was not repealed before it took effect, the Murphy amendment was permanently reinstated in 1996 (with some alterations).  Age Discrimination in Employment Amendments of 1996, Pub. L. No. 104-208, tit. I, § 119(1), 110 Stat. 3009-23 to -24.

Whether or not it was advisable to exempt law enforcement officers and firefighters from the protections of the ADEA, it was well within Congress' legislative prerogative to do so.  Therefore, under present law, it is permissible to impose a mandatory retirement age on law enforcement officers and firefighters if certain requirements in section 4(j) are met.  § 623(j).  In the present case, the only dispute is whether the requirements of section 4(j)(2) are met:

> It shall not be unlawful for [a state or local government] to . . . discharge any individual [law enforcement officer or firefighter] because of such individual's age if such action is taken . . . (2) pursuant to a *bona fide* hiring or retirement plan that is *not a subterfuge* to evade the purposes of this chapter.

§ 623(j) (emphasis added).  As this court previously held, it is the plaintiff's burden to prove either that (1) the defendant's action was not taken pursuant to a bona fide retirement plan, or (2) the

---

[4]With only the Committee's summary of the Penn State study in hand, the court does not know the context of this statistic.  However, it is curious that the study would report *both* that age is a "very poor predictor," *and* that age-based criteria are necessary (as the Committee suggests) to prevent 8.75 injuries or deaths per 100,000 public safety officers.  The court queries whether other, more obvious criteria would yield similar or worse numbers.  For example, how many injuries and deaths would be prevented if criteria such as smoking, percent body fat, hypertension, cholesterol, or waist-line size were used to screen public safety officers instead of age?

[5]The Committee cited the cost to state and local governments of implementing testing procedures and defending law suits, and the potential adverse impact of testing on women and minorities as other reasons for its recommendation.  H.R. Rep. No. 103-314, at 10-12.

retirement plan is a subterfuge to evade the purposes of the ADEA. *Breitigan*, 350 F. Supp. 2d at 575 n.3. *See also Minch v. City of Chicago*, 363 F.3d 615, 627-28 (7th Cir. 2004).

### A.      The "Bona Fide" Criterion

Proper disposition of these summary judgment motions turns in part on the definition of "bona fide" in section 4(j)(2).  In *McMann*, the Supreme Court accepted a concession by the parties that the plan at issue was bona fide "in the sense that it exists and pays benefits."  434 U.S. at 194. Over a decade later, in *Public Employees Retirement System of Ohio v. Betts*, the Court relied on *McMann* and accepted an identical concession from the parties.  492 U.S. 158, 166 (1989) ("All parties apparently concede, moreover, that [the] plan is 'bona fide,' in that '"exists and pays benefits."' *McMann*, 434 U.S. at 194; *see id.* at 206-207 (White, J., concurring in judgment).").  More recently, in partially denying the County's motion to dismiss, this court followed the guidance provided by *McMann* and *Betts*, and stated that a "retirement plan is 'bona fide' within the meaning of the ADEA if it 'exists and pays benefits.'" *Breitigan*, 350 F. Supp. 2d at 576 (quoting *Betts*, 492 U.S. at 166).

Breitigan argues that such a limited definition is inconsistent with the written-notice requirement of two administrative regulations:

> "Bona fide employee benefit plan." Section 4(f)(2) applies only to bona fide employee benefit plans.  A plan is considered "bona fide" if its terms (including cessation of contributions or accruals in the case of retirement income plans) have been accurately described in writing to all employees and if it actually provides the benefits in accordance with the terms of the plan.  Notifying employees promptly of the provisions and changes in an employee benefit plan is essential if they are to know how the plan affects them.  For these purposes, it would be sufficient under the ADEA for employers to follow the disclosure requirements of ERISA and the regulations thereunder.  The plan must actually provide the benefits its provisions describe, since otherwise the notification of the provisions to employees is misleading and inaccurate.

29 C.F.R. § 1625.10(b) (2005).

> Unless the essential terms and conditions of an alleged seniority system have been communicated to the affected employees and can be shown to be applied uniformly to all of those affected, regardless of age, it will not be considered a bona fide seniority system within the meaning of the Act

29 C.F.R. § 1625.8©).  Although these regulations literally apply only to section 4(f)(2), Breitigan contends that they govern section 4(j)(2) as well, and therefore, that they are entitled to deference.

The court disagrees.  Although the statutory interpretation of section 4(j)(2) is somewhat guided by prior interpretations of section 4(f)(2), *Breitigan*, 350 F. Supp. 2d at 576 n.4, it does not necessarily follow that administrative regulations specifically tailored to the latter are entitled to deference by a court interpreting the former.  In this case, the regulations pointed to by Breitigan were drafted with an eye toward giving full effect to the legislative history of section 4(f)(2), by construing its terms in the manner least detrimental to persons against whom it is invoked.  *See* § 1625.10.[6]  Although that may be a fair reading of the legislative history behind section 4(f)(2), *see,*

---

[6]In particular, section 1625.10 provides:

> The legislative history of this provision indicates that its purpose is to permit age-based reductions in employee benefit plans where such reductions are justified by significant cost considerations.  Accordingly, section 4(f)(2) does not apply, for example, to paid vacations and uninsured paid sick leave, since reductions in these benefits would not be justified by significant cost considerations.  Where employee benefit plans do meet the criteria in section 4(f)(2), benefit levels for older workers may be reduced to the extent necessary to achieve approximate equivalency in cost for older and younger workers.  A benefit plan will be considered in compliance with the statute where the actual amount of payment made, or cost incurred, in behalf of an older worker is equal to that made or incurred in behalf of a younger worker, even though the older worker may thereby receive a lesser amount of benefits or insurance coverage.  Since section 4(f)(2) is an exception from the general non-discrimination provisions of the Act, the burden is on the one seeking to invoke the exception to show that every element has been clearly and unmistakably met.  The exception must be narrowly construed.

9

*e.g.,* H.R. Rep. No. 90-805 (1967), *as reprinted in* 1967 U.S.C.C.A.N. 2213, 2217 (explaining that section 4(f)(2) "serves to emphasize the primary purpose of the bill – the hiring of older workers – by permitting employment without necessarily including such workers in employee benefit plans"), it is *not* a fair reading of the legislative history behind section 4(j). In passing that section, Congress intended to act in the perceived interest of public safety rather than the interest of aging law enforcement officers and firefighters. *See, e.g.,* 132 Cong. Rec. at 25448 (statement of Rep. Hughes). Thus, using legislative history as a guide, regulations construing the terms of section 4(j)(2) would, in all likelihood, be appreciably different than regulations construing the terms of section 4(f)(2) (i.e., sections 1625.10(b) and 1625.8). Moreover, reliance on legislative history to construe terms in either section is suspect because the Supreme Court explicitly rejected that approach with regard to "subterfuge" in section 4(f)(2) on two separate occasions. *McMann*, 434 U.S. at 199 (stating that legislative history "is irrelevant to an unambiguous statute"); *Betts*, 492 U.S. at 172 ("In view of our interpretation of the plain statutory language of the subterfuge requirement, however, this reliance on legislative history is misplaced."). Therefore, the court holds that sections 1625.10(b) and 1625.8 are entitled to no deference.

Breitigan further argues that the court should not rely on dicta in *McMann* and *Betts* to narrowly define a bona fide plan as one that merely exists and pays benefits. On this point, the court agrees. A full reading of *McMann* and *Betts* reveals that the Supreme Court did not intend to offer a precise definition of "bona fide" in those cases. At a minimum, the definition of "bona fide" must incorporate the ordinary meaning: "made in good faith without fraud or deceit," Webster's Third New International Dictionary 250 (Philip Babcock Gove, ed., Merriam-Webster, Inc. 1993); *see also* Black's Law Dictionary 177 (6th ed. 1990) (defining "bona fide" as "[i]n or with good faith;

honestly, openly, and sincerely; without deceit or fraud"). *Cf. McMann*, 434 U.S. at 203 ("In ordinary parlance, and in dictionary definitions as well, a subterfuge is a scheme, plan, stratagem, or artifice of evasion. In the context of this statute, 'subterfuge' must be given its ordinary meaning and we assume Congress intended it in that sense."). The definition must also be tailored to the context of the ADEA if it is to be of practical use: a bona fide plan must "exist and pay benefits." *McMann*, 434 U.S. at 194; *Betts*, 492 U.S. at 165. Therefore, the court holds that a retirement plan is bona fide for the purposes of section 4(j)(2) if it (1) is untainted by bad faith, fraud, or deceit, and (2) exists and pays benefits. *Cf. Robertson v. Mobil Oil Corp.*, 778 F.2d 1005, 1008 (3d Cir. 1985).[7]

---

[7]In *Robertson*, the Third Circuit used a similar method to define "bona fide customer complaints" as used in the Petroleum Marketing Practices Act ("PMPA"):

> The common legal definition of bona fide, consistent with the non-legal definition, is "in or with good faith; honestly, openly, and sincerely . . . Real, actual, genuine, and not feigned." Black's Law Dictionary (5th ed. 1979). *See also E.E.O.C. v. Westinghouse Electric Corp.*, 725 F.2d 211, 225 (3d Cir. 1983) (using "bona fide" to mean genuine in context of statutory requirement of bona fide retirement plan).
> . . .
> At the same time, we believe that something more than the common definition of bona fide must be read into the notion of bona fide complaints under PMPA. Otherwise, inaccurate though sincere complaints would justify non-renewal and [the] PMPA's purpose of protecting franchisees from unfair termination or non-renewal, *see* S. Rep No. 731, 95th Cong., 2d Sess. 17-19 reprinted in 1978 U.S. Code Cong. & Ad.News 873, 875-77, would be defeated.
> . . .
> A definition of "bona fide" in PMPA that accommodates common usage and is fair to all parties is "sincere and having a reasonable basis in fact." The "basis in fact" requirement entails that the circumstance complained of does, in fact, exist, and that the franchisee can reasonably be held accountable for it. Thus the receipt of numerous sincere complaints is not ground for non-renewal if the complaints are false or if they pertain to matters about which the franchisee is not culpable, e.g., policies required by the franchisor.

778 F.2d at 1008.

11

Accordingly, Breitigan can survive the County's motion for summary judgment by adducing evidence either that (1) the retirement plan is tainted by bad faith, fraud, or deceit, or (2) it does not exist and pay benefits.

Evidence that he was not given notice of the plan's terms, while relevant, is insufficient standing alone to satisfy this burden.  For example, in *Veneziano v. Long Island Pipe Fabrication & Supply*, the plaintiff sued his insurance carrier under New Jersey's anti-discrimination law after his coverage was cancelled without notice, in violation of state regulations.  79 Fed. Appx. 506, 511 (3d Cir. 2003) (non-precedential).  The plaintiff argued that the insurance carrier could not invoke the protection of a statutory provision exempting the providers of "bona fide" insurance plans from the ant-discrimination law due to the nature of the cancellation (i.e., without notice).  Citing *Betts*, the Third Circuit rejected the plaintiff's argument because the insurance carrier fell "squarely within the definition of 'bona fide' set forth by the Supreme Court for an analogous provision in the Age Discrimination in Employment Act – the plan must only 'exist and pay benefits.'"  *Id.  See also Brennan v. Taft Broadcasting Co.*, 500 F.2d 212, 217 (5th Cir. 1974) (holding that the "bona fide" requirement of section 4(f)(2) does not require notice where the plaintiff had elected to participate in a retirement plan without being provided with all of the plan's material provisions).  Thus, according to *Veneziano*, the bona fides of a plan cannot be cast into doubt by mere lack of notice. Instead, there must be actual evidence of misdirection, evidence that information was purposely withheld, etc.  *See Marshall v. Haw. Tel. Co.*, 575 F.2d 763, 766 (9th Cir. 1978) (squarely rejecting a notice requirement, but suggesting that the bona fides of a plan can be undermined by an employer's deception).

The Seventh Circuit's holding in *Sexton v. Beatrice Foods, Inc.*, 630 F.2d 478 (7th Cir.

12

1980), does not support a contrary result.  In that case, the plaintiff-employee was forced into early

retirement by the defendant-employer.  *Id.* at 479.  The defendant sought to shield itself from

liability pursuant to section 4(f)(2) by arguing that its action was in observation of a bona fide

retirement plan.  *Id.* at 480.  However, because the retirement plan at issue did not expressly permit

enforcement of a mandatory retirement age, the court held that the defendant had not technically

"observe[d] the terms" of a bona fide plan, as required by section 4(f)(2).  *Id.* at 489.  In so doing,

the court explained at length the paramount importance of empowering employees to make informed

decisions about their retirement needs by providing them adequate notice of their plan's terms.  *Id.*

at 483; *id.* at 489.  Yet, it would be erroneous to conclude that the *Sexton* court engrafted an explicit

notice requirement where Congress provided none.  Rather, the court merely construed section

4(f)(2) narrowly as a matter of policy.

　　　　In this case, and in spite of Breitigan's protestations to the contrary, there is no question that

the County's plan expressly permits the enforcement of a mandatory retirement age.  Every

collective bargaining agreement in the summary judgment record, covering the years 1983 to 2005,

contains the following language (or language very similar):

> 　　　　Effective July, 1973 New Castle County Code, Section 11A-6, Employees
> Retirement System, shall become an integral part of this agreement, including the
> following amendment:
> . . .
> A County Police Officer who enters the County Police service after July 1, 1973,
> completing at least 20 years of County Police service may retire at his/her option at
> any age up to age 55 *which is mandatory* and receive a service retirement annuity.

1986-1989 Agreement Between New Castle County and Fraternal Order of Police Lodge No. 5

Representing New Castle County Police, ¶ 70 (emphasis added).  (D.I. 93 App. Ex. A, Logan Aff.

Ex. 1 at 8.)  Section 11A-6 of the New Castle County Code, which is referenced by the collective

bargaining agreements, is in accord:

> A County police officer, completing at least twenty (20) years of credited service, may retire at his or her option at any age up to fifty-five (55), *which is mandatory*, and receive a service retirement annuity.

New Castle County, Del., Code ("NCCC") § 26.04.106(A) (2000) (emphasis added).

Breitigan reads this language to mean that only police officers who have completed at least twenty years of service must retire at age fifty five, or conversely, that retirement is *not* mandatory for an officer who has completed less than twenty years of service by his fifty-fifth birthday. The court, on the other hand, understands this language to mean that police officers completing at least twenty years of service may retire at any time, but in no case will an officer be permitted to continue working beyond his fifty-fifth birthday. Any and all doubt that the court's interpretation is correct is resolved by the "Retirement" provision in the New Castle County Code: "The compulsory retirement age for a police officer shall be his or her 55th birthday." NCCC § 26.03.908(B). Breitigan's response – that he should not have been expected to "stumble across" section 26.03.908(B) on his own due to its allegedly peculiar placement in the county code – is triply unpersuasive. First, the placement of section 26.03.908(B) is quite logical: it is located in the "Human Resources" chapter of the New Castle County Code under the heading "Retirement." Second, Breitigan cites no authority for the proposition that (allegedly) incomprehensibly-organized laws are any less binding than those that are well organized. *See, e.g.,* 26 U.S.C. §§ 1-9833 (Internal Revenue Code). And third, since a bona fide plan need not provide notice, the organizational scheme of the underlying ordinances is irrelevant.[8]

---

[8]The court is also unpersuaded by Breitigan's contention that the pension and retirement ordinances are contradictory. As far as the court can tell, he is merely recycling an argument already rejected once in this case. *Breitigan*, 350 F. Supp. 2d at 580-81.

Since there is also no question that the plan exists and pays benefits (Breitigan Dep. at 77:19-24), the only outstanding issue is whether Breitigan has adduced sufficient evidence of bad faith, fraud, or deceit to cast doubt upon the bona fides of the plan.  To that end, Breitigan points to the declaration of David Riddell, a Senior Sergeant in charge of the training academy for New Castle County Police Department's new recruits when Breitigan joined the force in 1988.  (Riddell Decl. ¶ 1.)  During Breitigan's time in the academy, he was asked by Riddell "if anyone had talked to him about there being a mandatory retirement age."  (Id. ¶ 3.)  Breitigan said no one had, so Riddell went to his superiors and "asked whether Breitigan would be prevented from obtaining 20 years service credit because of his age."  (Id. ¶¶ 3-4.)  One those superiors told Riddell to "tell Breitigan not to worry about it, because it was not an issue."  (Id. ¶ 5.)  Riddell then relayed that information to Breitigan, as instructed.  (Id. ¶ 6.)  Breitigan also points to the declaration of Vaughn Dale, the Captain in command of the training unit for new recruits in 1988.  (Dale Decl. ¶¶ 1-2.)  Although Dale was not aware of a mandatory retirement age, he took it upon himself to ask the then-Chief of Police "if there would be a problem with hiring Breitigan because of his age."  (Id. ¶ 3.)  The Chief, who was "sensitive to legal issues," responded that "the police could not discriminate based on age, and as long as Breitigan could perform adequately, he would be eligible for the job."  (Id. ¶ 5.)  Possibly because Dale was told his concerns were unfounded, he never relayed the Chief's response to Breitigan.  (Id. ¶ 6.)  Based on this evidence, the court believes a reasonable factfinder could infer, but need not, that the County acted in bad faith and deceived Breitigan to such an extent that the retirement plan is not bona fide.  Consequently, both parties' motions for summary judgment will be denied.

**B.      The "Subterfuge" Criterion**

The meaning of the term "subterfuge" as it appears in section 4(j)(2) was persuasively addressed by the Seventh Circuit in *Minch*:

> What is necessary to establish subterfuge is proof that the employer is using the [section 4(j)] exemption as a way to evade another substantive provision of the [ADEA]. . . . Both of the hypotheticals that *Betts* used to illustrate this point envision the employer making an age-based distinction that is expressly permitted by the statute as a means of committing another kind of discrimination that the ADEA prohibits. Here then, a viable claim of subterfuge would require the plaintiffs to allege that [the defendant] took advantage of the statutory authorization to mandatorily retire police officers and firefighters as a means of discriminating in another aspect of the employment relationship – that is, other than in the discharge decision – in a way that the statute forbids.
> . . .
> First, as *Betts* makes clear and as the district court recognized, a plaintiff of course would have a claim for subterfuge if a city or state government exercised its right to reimpose age limits in order to retaliate against one or more employees for protesting practices made illegal by the ADEA. . . . [Second,] if it were shown that a public employer had reinstated mandatory retirement for police and firefighting personnel pursuant to section 623(j) but, at the same time, created a new, lower-paying position not restricted by age and invited the mandatorily-retired officers to apply for that position, then it could be inferred that the employer was using its mandatory retirement program as a subterfuge for wage discrimination against older employees.

363 F.3d at 629-30.

Breitigan argues that the County's retirement plan is a subterfuge for two reasons. First, as he does with regard to the bona fides of the plan, Bretigan points to a portion of the regulatory definition of "subterfuge," which specifically addresses mandatory retirement ages:

> Involuntary retirement clauses. Any provision of an employee benefit plan which requires or permits the involuntary retirement of any individual specified in section 12(a) of the Act on the basis of age is a subterfuge to evade the purpose of the Act and cannot be excused under section 4(f)(2).

29 C.F.R. § 1625.10(d)(7). In addition to the reasons stated above for rejecting the regulatory definition of "bona fide," the court also rejects this regulation because it is manifestly contrary to the language of section 4(j): "It shall not be unlawful for [a local government] . . . to discharge any

individual because of such individual's age if such action is taken [in accordance with several requirements]." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (explaining that "regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute"). Therefore, section 1625.10(d)(7) is entitled to no deference.

Second, Breitigan contends that the plan is a subterfuge to evade section 4(f)(2) – an affirmative defense – by limiting his ability to accumulate pension benefits. An affirmative defense is a statutory device that provides the defendant with an opportunity to escape liability for an otherwise unlawful action. Thus, the court is at a loss to understand why the County would be using its retirement plan to evade such a device.[9]

## VI.    CONCLUSION

In sum, the court holds that Breitigan has raised a genuine issue of material fact as to whether the County's retirement plan is bona fide as defined above. As a result, the court will deny both motions for summary judgment and permit this matter to proceed to trial.

---

[9]The court is similarly confused by Breitigan's contention that the County's retirement plan "violates" section 4(f)(2). Once again, section 4(f)(2) is an affirmative defense. As such, it does not establish liability for unlawful actions, and therefore, cannot be "violated."

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD W. BREITIGAN,        )
                                     )
           Plaintiff,        )
                                     )
          v.             )     C.A. No. 02-1333-GMS
                                     )
NEW CASTLE COUNTY,        )
                                     )
          Defendant.     )

## **ORDER**

IT IS HEREBY ORDERED THAT:

1.     The defendant's motion for summary judgment (D.I. ) be DENIED; and

2.     The plaintiff's motion for partial summary judgment (D.I. ) be DENIED.

Dated: December 27, 2005           /s/ Gregory M. Sleet_____
                                          UNITED STATES DISTRICT JUDGE